[No. D040390. Fourth Dist., Div. One. June 17, 2003.]

DOUGLAS S. BYARS, Plaintiff and Appellant, v.
SCME MORTGAGE BANKERS, INC., Defendant and Respondent.

**COUNSEL**

Dougherty, Hildre, Dudek & Haklar; Finkelstein & Krinsk, Peggy J. Reali; Zimmerman Reed and Hart L. Robinovitch for Plaintiff and Appellant.

Severson & Werson, William L. Stern, Katherine A. Knopoff and Daniel O'Rielly for Defendant and Respondent.

**OPINION**

McCONNELL, J.—This case, an appeal from a grant of summary judgment, involves the validity of a yield spread premium (YSP) (a rebate paid to a mortgage broker by a lender) on a Federal Housing Administration (FHA) insured loan that has a cap of 1 percent on the loan origination fees that may

be directly charged to the borrower. We conclude payment of a YSP does not violate the applicable regulations and therefore did not violate a provision in Byars's deeds of trust requiring compliance with United States Department of Housing and Urban Development (HUD) regulations. We further conclude that summary judgment was properly granted on Byars's Business and Professions Code section 17200 claim alleging the lender engaged in deceptive business practices by not directly disclosing to him that his loans were at an above-par rate of interest. Finally, we reject Byars's contention that the court erred in excluding the deposition testimony of an expert witness deposed in another case.

### FACTUAL AND PROCEDURAL BACKGROUND

In February 1997, Douglas S. Byars used a mortgage broker, Spectrum Financial Group (Spectrum), to obtain an FHA loan to purchase a home. Byars did not investigate interest rates, but relied on Spectrum to obtain "the going rate." Byars did not know or care how Spectrum was being paid for its services. Byars paid a 1 percent loan origination fee which was paid to Spectrum. Spectrum placed the loan with SCME Mortgage Bankers, Inc. (SCME).[1] Byars was unable to recall any discussions at the close of escrow about the fees and costs of the loan, including a "broker rebate," but acknowledged that at the time of his deposition he was unable to say that such discussions did not occur, only that he could not recall any such discussions. The HUD-1 settlement statement provided to Byars included the statement "[b]roker rebate pd by lender to Broker $1,685.58." At the time of the transaction, the interest rate and Spectrum's performance were acceptable to Byars. However, at the time of his deposition, Byars, after having spoken with his attorneys, believed he should have received a better interest rate although he did not know what rate he could have obtained.

In December 1997, Byars refinanced the loan using a different mortgage broker, Allstate Mortgage Corporation (Allstate). This loan was also placed with SCME. Allstate told Byars it would obtain a loan at "the going rate." Byars did not independently investigate the available interest rates. Byars's main objective was to remove his father from the loan (his father had cosigned the original loan). Allstate told Byars there would be "no cost" to refinance the loan. Allstate, however, required Byars to pay $300 for a new appraisal report and eventually charged other costs, including a loan origination fee of $955. The HUD-1 settlement statement for the refinance stated: "BROKER REBATE PAID BY SCME ALLSTATE MORTGAGE $1,586.78." Byars was dissatisfied with Allstate, feeling the broker was unprofessional, failed to answer his questions, misrepresented that the loan

---

[1]SCME Mortgage Bankers, Inc., was erroneously sued as SCME Mortgage Brokers, Inc.

would be at no cost to him, and believed he was overcharged for the loan (i.e., paid a higher interest rate).

In neither transaction, was Byars shown SCME's rate sheet that shows SCME's par interest rate and above par interest rates with the YSP that SCME will pay to mortgage brokers.

The record does not contain any depositions or declarations from the brokers who assisted Byars in obtaining the loans. The record does contain a deposition of an SCME vice-president of quality assurance and compliance, Roberta Andrews. Andrews testified an FHA loan must comply with HUD regulations. She was not the person at SCME who was in charge of reviewing HUD regulations vis-à-vis what fees could be charged. She explained a YSP "is a dollar amount expressed as a percentage of the loan amount that exceeds a par price on a loan." "A par price would be a loan with no points, [and] no discount." A par loan has no YSP.[2] Andrews testified that generally if a borrower uses a mortgage broker and selects an interest rate that has no YSP (i.e., is at par or a below par rate), the broker would charge the borrower discount points so that the borrower would have to pay "cash out of pocket" to the broker.

SCME publishes daily "rate sheets" which reflect its par rate and the YSP's that will be paid to brokers for different interest rates above the par rate. Mortgage brokers are provided with "wholesale" rate sheets. SCME does not directly disclose these rate sheets to borrowers. SCME also had retail rate sheets which it provides to borrowers who dealt directly with SCME. Andrews believed that the brokers in this case, Spectrum and Allstate, would have had their own internal rate sheets that they would provide to borrowers.

Andrews testified that payment of YSP's is standard in the industry. The YSP reflects payment for goods, services, or facilities provided by the broker on behalf of the borrower for the transaction. SCME does not investigate what particular services, goods, or facilities are provided by the brokers; payment of the YSP's to the brokers is based on the fact loans are at an above par interest rate. Andrews did not know what services had been provided by Byars's brokers, pointing out that Byars's brokers would have that information. She testified that the HUD regulations do not require the lender to review the agreement between the broker and borrower. She did not know if the YSP's on these loans were used to offset any of Byars's closing costs; she did not know what arrangement Byars had negotiated with

---

[2] A loan discount consists of "points over and above par that would be charged to the borrower, typically to obtain the loan at the desired rate."

his brokers. Andrews noted that the Allstate mortgage broker had paid some of the YSP to SCME to cover fees typically covered by a seller in a transaction but could not be charged to any seller since this was a refinance of the loan.

## DISCUSSION

### I

### *Summary Judgment and Appeal Standard*

A defendant seeking summary judgment must show that the plaintiff's cause of action has no merit, e.g., that the plaintiff cannot establish one or more of the elements of his or her cause of action. (Code Civ. Proc., § 437c, subd. (*o*)(2).) The burden then shifts to the plaintiff to show that there is a triable issue of material fact existing as to the cause of action or the defense. (*Ibid.*; *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 72 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) "For the summary judgment motion to have properly succeeded, the evidence must have left no room for conflicting inferences as to material facts. '[S]ummary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.' (Code Civ. Proc., § 437c, subd. (c).)." (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 735 [80 Cal.Rptr.2d 506, 968 P.2d 65], disapproved on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

■ "On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Galanty v. Paul Revere Life Ins. Co.* (2000) 23 Cal.4th 368, 374 [97 Cal.Rptr.2d 67, 1 P.3d 658].)

The appellant has the burden of showing error occurred. (See *Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 [41 Cal.Rptr.2d 362, 895 P.2d 469]; *Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474 [52 Cal.Rptr.2d 678].) An appellant must support his argument in the briefs by appropriate references to the record, which includes providing exact page citation. (Cal. Rules of Court, rule 14(a)(1)(C); *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 [277 Cal.Rptr. 401].) "An appellate court is not required to search the record to determine whether or not [it] supports appellants' claim of error. It is the

duty of counsel to refer the reviewing court to the portions of the record which support appellants' position." (*Green v. City of Los Angeles* (1974) 40 Cal.App.3d 819, 835 [115 Cal.Rptr. 685].)

## II

### *Regulatory Scheme*

### (A)  *Yield Spread Premiums*

"A yield spread premium, or 'YSP,' is a lump sum paid by a lender to a broker at closing when the loan originated by the broker bears an above-par interest rate." (*Schuetz v. Banc One Mortg. Corp.* (9th Cir. 2002) 292 F.3d 1004, 1007.) HUD has explained: "Payments to brokers by lenders, characterized as yield spread premiums, are based on the interest rate and points of the loan entered into as compared to the par rate offered by the lender to the mortgage broker for that particular loan (e.g., a loan of 8% and no points where the par rate is 7.50% will command a greater premium for the broker than a loan with a par rate of 7.75% and no points). In determining the price of a loan, mortgage brokers rely on rate quotes issued by lenders, sometimes several times a day. When a lender agrees to purchase a loan from a broker, the broker receives the then applicable pricing for the loan based on the difference between the rate reflected in the rate quote and the rate of the loan entered into by the borrower. . . ." (Real Estate Settlement Procedures Act Statement of Policy 1999-1, 64 Fed.Reg. 10080, 10081 (Mar. 1, 1999) (1999 Statement of Policy), fn. omitted.)

The Real Estate Settlement Procedures Act of 1974 (RESPA), an act that seeks to protect real estate consumers "from unnecessarily high settlement charges caused by certain abusive practices" (12 U.S.C. § 2601(a)), prohibits the payments of kickbacks or referral fees "incident to or a part of a real estate settlement service." (12 U.S.C. § 2607(a), (b).) RESPA does not prohibit "the payment to any person of a bona fide . . . compensation or other payment for goods or facilities actually furnished or for services actually performed." (12 U.S.C. § 2607(c)(2).)

HUD in its 1999 statement of policy made it clear that YSP's are not per se legal or illegal, there must be an individualized examination of the particular transaction at issue. (1999 Statement of Policy, 64 Fed.Reg., *supra*, at p. 10084.) HUD adopted a two-prong test for determining whether a YSP was permissible: (1) "whether goods or facilities were actually furnished or services were actually performed for the compensation paid"; and (2) "whether the payments are reasonably related to the value of the

goods or facilities that were actually furnished or services that were actually performed." (*Ibid.*)

Under the first prong, HUD lists a number of services that are normally performed by a broker in originating a loan, such as prequalifying a borrower to determine the maximum mortgage the borrower can afford, initiating appraisal and credit reports, and ordering legal documents. (1999 Statement of Policy, 64 Fed.Reg., *supra,* at p. 10085.) Under the second prong, it is only necessary that the total compensation paid to the broker (including both direct payments by the borrower to the broker and a YSP paid by a lender) is reasonably related to the total value of the goods or services provided by the broker. (*Id.* at p. 10084.) This total compensation must be commensurate with the amount normally charged for similar services in similar transactions in similar markets. (*Ibid.*) "If the payment or a portion thereof bears no reasonable relationship to the market value of the goods, facilities or services provided, the excess over the market rate may be used as evidence of a compensated referral or an unearned fee . . . ." (*Id.* at p. 10086.)

In 2001, HUD confirmed its 1999 statement of policy and clarified that as to the first prong of its test, "a yield spread premium can [not] be presumed to be a referral fee based solely upon the fact that the lender pays the broker a yield spread premium that is based upon a rate sheet, or because the lender does not have specific knowledge of what services the broker has performed." (Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1, 66 Fed.Reg. 53052, 53055 (Oct. 18, 2001) (2001 Statement of Policy).)

HUD's analysis has been followed by courts that have considered the validity of YSP's. (See, e.g., *O'Sullivan v. Countrywide Home Loans, Inc.* (5th Cir. 2003) 319 F.3d 732, 740-741; *Glover v. Standard Federal Bank* (8th Cir. 2002) 283 F.3d 953, 963-965; *Bjustrom v. Trust One Mortg. Corp.* (9th Cir. 2003) 322 F.3d 1201; *Schuetz v. Banc One Mortg. Corp., supra,* 292 F.3d at pp. 1012-1014; *Heimmermann v. First Union Mortg. Corp.* (11th Cir. 2002) 305 F.3d 1257, 1262-1263; *Bankers Trust v. McFarland* (2002) 192 Misc.2d 328 [743 N.Y.S.2d 804].) Here, Byars does not dispute that we should defer to HUD's interpretation.

(B) *HUD Limitations on Loan Origination Fees*

HUD also has delineated the fees that may be collected from a borrower seeking to obtain an FHA insured mortgage, including the loan origination fee and the compensation that may be paid by a borrower to a mortgage

broker in 24 Code of Federal Regulations part 203.27 (2003). In pertinent part, this regulation provides:

"(a)  The mortgagee [lender] may collect from the mortgagor [borrower] the following charges, fees or discounts: [¶] . . . [¶]

"(2)  A charge to compensate the mortgagee for expenses incurred in originating and closing the loan, the charge not to exceed:

"(i)  [Twenty] dollars or one percent of the original principal amount of the mortgage (excluding any one-time mortgage insurance premium paid pursuant to [24 C.F.R.] § 203.280 [2003]), whichever is the greater[.] [¶] . . . [¶]

"(e)  Nothing in this section will be construed as prohibiting the mortgagor from dealing through a broker who does not represent the mortgagee, if he prefers to do so, and paying such compensation as is satisfactory to the mortgagor in order to obtain mortgage financing." (24 C.F.R. § 203.27 (2003).)

III

*Whether the YSP Violated HUD's One Percent Limit on Loan Origination Fees*

■   Byars contends the fees paid to a mortgage broker for an FHA loan are limited by HUD regulations to the loan origination fee and may not exceed 1 percent of the loan amount. Therefore, Byars contends that the payment of a YSP by the lender to the mortgage broker for the broker's services results in illegal and excessive fees when the borrower has paid an upfront loan origination fee of 1 percent.

This issue was addressed by the court in *Bjustrom v. Trust One Mortgage Corp., supra,* 322 F.3d 1201 and we find the reasoning of that court to be persuasive. In *Bjustrom,* as here, there was a class action for breach of contract contending that the payment of a YSP by a lender to a mortgage broker violated the HUD regulation limiting loan origination fees to 1 percent of the loan amount, a regulation incorporated into the borrowers' contracts. The *Bjustrom* court rejected the claim, explaining that the "unambiguous language of the regulation itself [24 C.F.R. § 203.27(a)(2)(i) (2003)] limits only fees 'collect[ed] from the mortgagor' (the Bjustrom class) by the mortgagee (Trust One). [Citation.] The YSPs . . . at issue here were not collected from Bjustrom class members, but were instead collected from

Trust One by Mortgage Specialists [the mortgage broker]." (*Id.* at p. 1205.) The court found "that a plain reading of the regulation itself means *directly* collected, not *indirectly* collected." (*Ibid.*) As the lower court had explained in *Bjustrom* (in reasoning found persuasive by the Ninth Circuit Court of Appeals), "to assert 'that all borrowers ultimately pay for the yield service . . . premiums through high interest rates is too strained a reading of "collect" to compel inclusion of such *indirect* payments.' " (*Ibid.,* citing *Bjustrom v. Trust One Mortg.* (W.D.Wash. 2001) 178 F.Supp.2d 1183, 1190.) The lower court also observed it is not necessarily true that all borrowers paying YSP's are necessarily paying higher interest for the purpose of providing compensation to mortgage brokers; "HUD, for example, maintains that the proper use of premiums is to allow borrowers to pay lower cash up front in return for higher interest rates." (*Bjustrom v. Trust One Mortg., supra,* 178 F.Supp.2d at p. 1190; 2001 Statement of Policy, 66 Fed.Reg., *supra,* at pp. 53053-53054.) Other courts have found the 1 percent cap on origination fees does not apply to YSP's. (See, e.g., *Dominguez v. Alliance Mortg. Co.* (N.D.Ill. 2002) 226 F.Supp.2d 907, 910-911 and cases cited therein; *Geraci v. Homestreet Bank* (W.D.Wash. 2002) 203 F.Supp.2d 1211, 1213 [Veterans' Administration loan with 1 percent origination fees cap; "This claim [that payment of the YSP exceeds the 1 percent cap] fails for the simple reason that the yield spread premium at issue here was not charged against or paid by Mr. and Mrs. Geraci, but was instead paid by Homestreet Bank to Windermere."].)

Moreover, we note that 24 Code of Federal Regulations part 203.27(e) (2003) specifically states that nothing in that section is to be construed as prohibiting the borrower from dealing with a mortgage broker and paying such compensation "as is satisfactory to the mortgagor [borrower] in order to obtain mortgage financing." In other words, by its express terms, 24 Code of Federal Regulations part 203.27 (2003) does not limit a mortgage broker's fee to 1 percent of the loan amount.[3]

We find the reasoning of the *Bjustrom* cases to be persuasive. The payment of a YSP does not violate the HUD regulation imposing a 1 percent cap on loan origination fees.

To the extent that Byars argues that the YSP was improper in this case because the YSP was stated as a lump sum rather than as an itemized list of

---

[3]Byars argues that a YSP may not be paid to a mortgage broker unless some of the borrower's closing costs are paid by the lending institution. No HUD regulation so provides. Indeed, as we explain in the text, the HUD regulations recognize that YSP's may be paid as lump sums based on interest rates and loan amounts and are not required to be tied to particular services.

services and fees provided by the mortgage brokers, we find no merit. HUD has clearly indicated its approval of YSP statements as a lump sum, i.e., that it cannot be presumed that a YSP constitutes an improper fee based simply on the fact the lender does not know or does not specify the particular services provided by the mortgage broker. (2001 Statement of Policy, 66 Fed.Reg., *supra,* at p. 53055; see also *Schuetz v. Banc One Mortg. Corp., supra,* 292 F.3d at p. 1011.) Further, YSP's, by their very nature, are lump sums since they are calculated based on the amount of the loan and the interest rate. (See 2001 Statement of Policy, 66 Fed.Reg., *supra,* at pp. 53054-53055 [rejecting decision of Eleventh Circuit Court of Appeals that a YSP could be established as an illegal kickback or referral fee if it was calculated solely on the difference between the par interest rate and the rate of the delivered loan].)[4]

We also note the undisputed evidence in this case establishes that substantial services were provided by both the mortgage brokers to Byars and that Byars presented no evidence or argument to support a claim that as to his particular loans the total compensation paid to the brokers was unreasonable in light of the amounts normally charged for similar services in similar transactions in his area. Thus, he has not established that the YSP's in his particular case were improper.

No reversal is merited on this ground.

IV

*Business and Professions Code Section 17200 Claim*

Byars argues we must reverse the grant of summary judgment on his cause of action for deceptive business practices under Business and

---

[4]Byars's reliance on an informal opinion of the Office of the Attorney General, stating that "Mortgage lenders are compensated for their general costs of doing business *only through* the 1% loan origination fee permitted by [24 Code of Federal Regulations part] 203.27(a)(2) [2003]" (HUD Directive No. GHH-0074 (July 21, 1993), italics added) for the proposition that mortgage brokers may not recover any fees in excess of the 1 percent loan origination fee, is misplaced. First, this statement is dicta; the opinion was issued in response to a question as to how much could be charged for recording fees. More importantly, it reflects regulations affecting only what a lender may charge a borrower in upfront fees for a loan. Further, all lenders are also compensated for their costs of doing business through the interest rate charged to the borrower and are not prohibited from issuing loans at above par rates that generate greater profit for the lender. A lender who offers a loan directly to a borrower at an above par interest rate is entitled to keep the amount of the YSP that it would have paid to a mortgage broker had the borrower obtained the loan through such a broker. Byars's reliance on HUD Directive No. 4155.1 REV-4 CHG-1 (Sept. 1995) for the proposition that a lender may not pay mortgage broker fees is also misplaced. The cited language refers to situations where the borrower is required to pay cash upfront to the mortgage broker.

Professions Code section 17200 (section 17200) because his claim was not merely derivative of his contract cause of action, the trial court failed to address this cause of action in its grant of summary judgment, and he has raised triable issues of fact making summary judgment improper.

In his complaint, Byars's allegations included theories that were derivative of his contract cause of action, e.g., that SCME engaged in an unlawful business practice by the payment of the YSP's that violated the 1 percent cap on origination fees. Byars, however, also alleged that SCME violated section 17200 by failing to disclose that he was being charged an above-par interest rate to fund the payment of the YSP.[5] He alleged that had the information been disclosed, he would have had the opportunity to negotiate more favorable terms on his loan. At oral argument on the summary judgment motion, Byars focused on this theory, urging the trial court not to grant summary judgment because an independent ground existed for his section 17200 claim.[6]

Initially, we note that the trial court's failure to state reasons for granting summary judgment on the section 17200 claim violated Code of Civil Procedure section 437c, subdivision (g). However, reversal for a failure to state reasons is not required if the failure was harmless "since ' "[i]t is the validity of the ruling which is reviewable and not the reasons therefore." ' " (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448-449 [105 Cal.Rptr.2d 856].) If independent review establishes the validity of the judgment, then the error is harmless. (*Id.* at p. 449.) An example of when a failure to state reasons would not be harmless is when the trial court has discretion to ignore a party's declaration that conflicts with the party's deposition testimony. (*Ibid.*)

In part, the trial court's failure to state reasons is clearly harmless to the extent Byars's section 17200 claim was derivative of his contract cause of action (i.e., based on the asserted illegality of the YSP's), since his section 17200 claim fell with the contract cause of action. As to Byars's independent ground, i.e., that SCME engaged in a deceptive business practice by failing to disclose that the YSP was funded by an above-par interest rate, we also conclude the error was harmless. As we explain below, Byars failed to

---

[5]We note that Byars did not include a copy of his complaint in the record on appeal; we were required to call up the superior court file in order to see the complaint. We choose to disregard Byars's error and deal with the merits of his claim.

[6]SCME's assertion that Byars admitted that his unfair business practice claim was merely derivative is not supported by the record. Neither the citation provided by SCME for Byars's asserted "concession" his section 17200 claim was merely derivative nor our independent review of the record supports SCME's assertion.

present evidence sufficient to raise a triable issue of fact. Therefore, as a matter of law, SCME was entitled to summary judgment.[7]

■ Section 17200, is violated if a business practice is unlawful *or* unfair *or* deceptive. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech Communications*).) "[A] practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229], disapproved on other grounds in *Cel-Tech Communications, supra,* at p. 187, fn. 12.) To show a business practice is unfair, the plaintiff must show the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech Communications, supra,* at p. 187.) To show that a business practice is deceptive, the plaintiff must show that members of the public are likely to be deceived. (*Walker v. Countrywide Homes Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1170 [121 Cal.Rptr.2d 79].) The deceptive business practices prong of section 17200 does not require establishing that anyone was actually deceived, relied on the fraudulent practice or sustained any damage. (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167 [93 Cal.Rptr.2d 439].)

A business practice that might otherwise be considered unfair or deceptive cannot be the basis of a section 17200 cause of action if the conduct has been deemed lawful. (*Cel-Tech Communications, supra,* 20 Cal.4th at p. 182 ["If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."].)

■ On appeal, Byars bases his section 17200 claim on SCME's allegedly deceptive, misleading, unfair and fraudulent acts of:

"([1]) intentionally failing to disclose and inform borrowers like Byars that additional broker fees had been charged to them and that their interest rates were inflated in order to fund those secret fees;

"([2]) engaging in the systematic 'fraudulent concealment' of material facts such as the rate sheets showing the base interest rate and the moneys

---

[7]We note that Code of Civil Procedure section 437c, subdivision (m)(2) prohibits an appellate court from affirming a grant of summary judgment on a ground not relied on by the trial court unless the appellate court permits supplemental briefing. We do not believe that supplemental briefing is required in this case since the issue was raised below and has already been briefed on appeal.

offered and paid to brokers for secretly steering borrowers into higher rate loans;

"([3]) attempting to influence consumer's mortgage brokers, who are fiduciaries, to self-deal, through the enticement of additional fees to be secretly charged to those consumers."

Initially, we note that the YSP's here were not "secretly charged." The undisputed evidence shows the payments of the YSP's to the brokers were disclosed to Byars on the HUD-1 settlement statements.

To support his theory that SCME engaged in deceptive business practices and that he raised triable issues of fact to support his theory, Byars relies on the deposition of SCME's vice-president Andrews. In particular, he relies on her testimony that SCME did not directly provide its wholesale rate sheets to borrowers, did not directly inform borrowers whether their interest rate was at an above par rate, and did not determine what services were provided by the mortgage broker.

The fact that SCME did not provide Byars with its wholesale rate sheet or inform Byars of the available interest rates does not tend to establish a violation of section 17200 by SCME since the undisputed evidence shows Byars dealt with a mortgage broker; he did not have any direct contact with SCME. Nor does SCME's ignorance of the specific services or goods encompassed within the YSP or whether a YSP was offsetting closing costs tend to establish a violation of section 17200 by SCME. As Andrews pointed out in her deposition, while there are various guidelines as to what services should be provided by a mortgage broker, the exact nature of the services provided and compensation to be paid to the broker is a matter to be negotiated between the broker and the borrower. We further note that HUD has indicated that payment of a YSP will not be found illegal simply on the basis the YSP was calculated based on a rate sheet and the lender does not exactly know what services were provided by the mortgage broker to the buyer. In other words, SCME's payment of the YSP without requiring a specification of the services provided by the brokers was lawful and therefore cannot constitute the basis of a section 17200 claim.

Additionally, to support his section 17200 allegations, Byars asserts the mortgage brokers never explained to him the YSP or its affect on his interest rate. Even assuming the record supports this assertion,[8] this evidence does not support a section 17200 claim against SCME. If anything, the evidence

---

[8]We note that Byars's citations to the record relate only to the December 1997 refinance and not to the February 1997 transaction and that at one of his cited pages the record indicates

supports a claim against his brokers.[9] The brokers, however, are not part of this lawsuit.

As to the claim that SCME attempted to influence mortgage brokers to self-deal through the enticement of YSP's "to be secretly charged" to borrowers, we again note that the YSP's were not secret; they were disclosed to Byars. We further note that YSP's are widespread and commonly used as a method to compensate mortgage brokers for services provided to borrowers and the lender (see *Bankers Trust v. McFarland, supra,* 743 N.Y.S.2d at p. 808 ["[YSP's] are accepted vehicles for lenders to compensate mortgage brokers for services rendered in the closing transaction"]) and there is no indication in this case that the YSP offered by SCME differed from the YSP's offered by other lenders or that Byars's brokers would have been willing to broker the loan only for the origination fee.

No reversal is merited on this ground.

## V

### *Exclusion of Deposition Testimony*

Byars contends the trial court erred in excluding the deposition testimony of William Heyman, a former HUD director of FHA lender activities and program compliance. Heyman was an expert witness for the defendants in the *Bjustrom* case.

Evidence Code section 1292, subdivision (a) addresses the use of former testimony given in another case and provides:

"Evidence of former testimony is not made inadmissible by the hearsay rule if:

---

that he could not recall the specifics of the conversations with his brokers about interest rates. We also note that Byars throughout his brief regularly failed to provide helpful citations to the record. For example, Byars regularly cited to only the first page of a multipage regulation in the clerk's transcript to support a specifically quoted sentence or two from the regulation.

[9]We note that Byars's deposition testimony indicates that the brokers told him they would obtain the "going rate." Byars did not present any evidence showing that the rates he obtained with their YSP's did not represent the going rate obtainable through a mortgage broker. We further note that we have determined that summary judgment was properly granted as to Byars's claims the YSP's here were improper. Thus, Byars's case is distinguishable from the cases which he cites in his brief where the brokers promised to obtain the best or lowest possible rate and, because of the procedural posture of the cases (decided on the pleadings) the YSP's were assumed to be illegal referrals or kickbacks. (See *Moses v. Citicorp Mortg., Inc.* (E.D.N.Y. 1997) 982 F.Supp. 897; *Hastings v. Fidelity Mortg. Decisions Corp.* (N.D.Ill. 1997) 984 F.Supp. 600; *Kerby v. Mortgage Funding Corp.* (D.Md. 1998) 992 F.Supp. 787 [note there were also allegations that the YSP's were intentionally concealed from the borrower by using a shell lender to fund the loan].)

"(1) The declarant is unavailable as a witness;

"(2) The former testimony is offered in a civil action; and

"(3) The issue is such that the party to the action or proceeding in which the former testimony was given had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party against whom the testimony is offered has at the hearing."

Byars bears the burden of showing Heyman's deposition testimony falls within an exception to the hearsay rule. (*Gatton v. A.P. Green Services, Inc.* (1998) 64 Cal.App.4th 688, 693 [75 Cal.Rptr.2d 523].) Former testimony from a deposition rather than a trial is problematic since depositions generally function as a discovery device where examination of one's own client is typically avoided so as not to reveal a weakness in the case or to prematurely disclose a defense. In contrast, at trial, the parties seek to resolve issues of liability and therefore " 'the interest and motive in cross-examination increases dramatically.' " (*Id.* at pp. 694-695.)

Here, while it is true that the underlying claims in *Bjustrom* are substantially identical to this case, nonetheless the defendant lender in the *Bjustrom* case did not have a similar motive to cross-examine the witness as did SCME in this case. In *Bjustrom*, Heyman was the defendants' expert witness and his testimony was given in a deposition. The defendant-lender in *Bjustrom* thus had no incentive or motive to cross-examine Heyman or to bring out facts favorable to its defense as would SCME have had in this case if Byars had proffered Heyman as an expert witness. The trial court properly denied admission of Heyman's deposition testimony.

No reversal is merited on this ground.

## DISPOSITION

The judgment is affirmed. SCME is awarded costs on appeal.

Huffman, Acting P. J., and Nares, J., concurred.